No. 44          August 10, 2017          781

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

RANDALL RAY RITZ,
*Respondent on Review.*

(CC 11CR1068; CA A152111; SC S063292)

On review from the Court of Appeals.*

Argued and submitted January 12, 2016.

Paul L. Smith, Deputy Solicitor General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ellen F. Rosenblum, Attorney General.

Anne Fujita Munsey, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Before Balmer, Chief Justice, and Kistler, Walters, and Landau, Justices, and Brewer and Baldwin, Senior Justices pro tempore, and Tookey, Judge of the Court of Appeals, Justice pro tempore.**

BALDWIN, S. J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further consideration.

_____

\* On appeal from Curry County Circuit Court, Jesse C. Margolis, Judge. 270 Or App 88, 347 P3d 1052 (2015).

\*\* Nakamoto, Flynn, and Duncan, JJ., did not participate in the consideration or decision of this case.

## BALDWIN, S. J.

The parties in this case raise the issue of whether the natural dissipation of alcohol in a suspect's body creates such an emergency that police officers may enter a suspect's home without a warrant in order to secure the suspect's blood-alcohol evidence. Article I, section 9, of the Oregon Constitution and the Fourth and Fourteenth Amendments to the United States Constitution prohibit unreasonable searches and generally treat warrantless searches as *per se* unreasonable. The warrant requirement, however, is subject to exceptions. One exception is for exigent circumstances, which include circumstances requiring officers to act quickly to prevent the destruction of evidence.

In this case, police officers entered the home of defendant, Ritz, without a warrant, to secure evidence of his blood-alcohol concentration (BAC) after having probable cause to believe that he had been driving under the influence of intoxicants (DUII), a misdemeanor offense. ORS 813.010(1). The state argues that the warrantless entry was justified because the natural dissipation of alcohol in defendant's body is a type of destruction of evidence that establishes an exigent circumstance.

The Court of Appeals upheld the trial court's denial of defendant's motion to suppress the blood-alcohol evidence. For the reasons that follow, the decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further consideration.

## I. BACKGROUND

The parties do not dispute the relevant findings of fact that the trial court made during a pretrial suppression hearing. On October 11, 2011, at about 10:15 p.m., officers were dispatched to a single-vehicle crash near defendant's trailer, where he resided with his girlfriend, Wilson-McCullough. Officers arrived shortly after 10:30 p.m. and found a truck disabled in a ditch next to defendant's driveway. Defendant was not there, but one officer, Deputy Lorentz, spoke with Wilson-McCullough, who confirmed that defendant had been driving the truck and suggested that defendant had been drinking earlier in the day. Wilson-McCullough also

allowed Lorentz to look through the front door into defen-
dant's trailer to see if defendant was inside. Lorentz did not
see defendant from the front door and conveyed his findings
to the other officers present. Although the officers could not
find defendant, they heard rustling in the brush around the
trailer, which they believed to be defendant attempting to
evade them.

While other officers remained at the scene to look
for defendant, Lorentz left to speak with the registered
owner of the disabled truck, a neighbor named Zimmerman.
Zimmerman told Lorentz that he had seen defendant driving
the truck erratically around the time of the police dispatch.
He also said that defendant appeared slumped over and
intoxicated at that time. Lorentz went back to defendant's
trailer and informed the other officers of Zimmerman's
statements.

With no luck finding defendant, officers began to
leave the scene. One officer, Trooper Spini, remained until
about 11:50 p.m., when he left for the Brookings Police
Department. He stayed there for about an hour and returned
to defendant's residence at about 12:56 a.m. As he drove up,
Spini saw defendant and Wilson-McCullough on a porch just
outside the trailer. Defendant immediately went into the
trailer and did not respond to Spini's subsequent requests
for defendant to come out. At around 1:05 a.m., Spini called
for assistance from other officers, including Lorentz and
officers from the Brookings Police Department, who arrived
about ten minutes later.

After the officers made additional attempts to
get defendant to exit voluntarily, Lorentz crawled into the
trailer through an open window and unlocked the front door,
allowing the other officers in. Defendant had locked himself
in a bathroom and initially refused officers' demands that
he come out. Defendant came out only when officers began
unscrewing the bathroom doorknob and threatened him
with a Taser. After defendant opened the bathroom door, offi-
cers detected an overwhelming odor of alcohol and observed
that defendant's speech was slurred and that his eyes were
watery and bloodshot. At that time, around 1:33 a.m., Spini
placed defendant under arrest.

Spini left the scene with defendant for the Curry County Jail at around 2:00 a.m. After arriving at the jail at around 2:23 a.m., defendant made incriminating statements. Spini had assumed that, if he asked defendant for consent to test his BAC, defendant would have refused to provide consent. But, before officers had the chance to ask for consent, defendant volunteered to take a breath test. The breath test showed that defendant, about four hours after he last drove, still had a BAC level of 0.14 percent, which is above the legal limit of 0.08. ORS 813.010(a).

Defendant was charged with DUII, ORS 813.010, and driving while suspended, ORS 811.182. Before trial, defendant moved to suppress all evidence that the officers obtained following their warrantless entry into his home. At the suppression hearing, Spini testified that one reason that he did not seek a warrant before entering the trailer was because he was concerned about the dissipation of alcohol in defendant's body. Spini understood that alcohol typically dissipates at an average of about 0.015 percent per hour, though he noted that dissipation rates vary from person to person. Spini further stated that it would take about 90 minutes for him to obtain a search warrant, although Lorentz testified that he could do so in about 45 minutes.

The trial court concluded that the officers developed probable cause to believe that defendant had committed a DUII after Lorentz spoke with Zimmerman—that is, before the officers completed their initial investigation. The trial court also concluded that, based on Spini's testimony, the officers had probable cause to believe that they could still obtain evidence of defendant's alleged DUII by taking a sample of defendant's blood or breath at the time the officers entered defendant's residence. Further, the trial court found that the officers entered the home without a warrant because, among other reasons, "the officers were concerned about the dissipation of alcohol in [] defendant's blood or breath if a blood or breath test was obtained." As a result, the trial court held that exigent circumstances "provide[d] a valid basis for entry into the trailer without a warrant in this case."

In reaching that result, the trial court rejected defendant's argument that any exigency was the result of improper officer delay. Defendant had argued that the officers could have applied for the warrant during the time between first leaving the scene and subsequently returning to the scene about an hour later. But, according to the trial court, the officers could not have obtained a warrant to search the trailer at that point because they had no reason to believe that he was in the trailer. The trial court instead found that the officers did not reasonably believe that defendant was in the trailer until they returned to the scene at around 1:00 a.m. The trial court found that, from that point on, officers did not unnecessarily delay entering defendant's residence and arresting him. As a result, the trial court denied defendant's motion to suppress.[1]

Defendant appealed, arguing that the natural dissipation of alcohol does not establish an exigency justifying a warrantless home entry. The state argued, on the other hand, that the exigent circumstances justifying a warrantless home entry may be established without regard to how long it would take the investigating officers to obtain a warrant. Instead, the state contended, the exigency is established when an officer has reason to believe that a DUII suspect has evidence of that DUII in his or her body and the suspect has refused to leave his or her home.

The Court of Appeals affirmed the trial court's order under both the state and federal constitutions and held that the natural dissipation of alcohol in defendant's body justified the warrantless entry that occurred in this case. *State v. Ritz*, 270 Or App 88, 100-01, 347 P3d 1052 (2015). Although the court reached the result sought by the state, it did not apply the reasoning that the state had presented. As an initial matter, the court held that, to prove an exigency, the state was required to show how long it would have taken to obtain a warrant. *Id.* at 97.

---

[1] The trial court relied on two other grounds to deny defendant's motion to suppress and justify the warrantless entry: hot pursuit and officer safety. To the extent that the state asserted those grounds on appeal, the Court of Appeals did not reach them, because it affirmed the trial court's ruling based solely on the state's destruction-of-evidence rationale. *State v. Ritz*, 270 Or App 88, 93, 347 P3d 1052 (2015). As a result, the only issue before this court is the state's destruction-of-evidence rationale.

Additionally, the court explained that, under the facts of this case, the state could establish an exigency only by showing that "the suspect's blood would have lost *all evidentiary value*" if the officers had waited to perform the search until after obtaining a warrant. *Id.* at 99 (emphasis added). The state had argued that previous decisions by this court had upheld exigency findings based on a showing that the suspect's blood would have lost only *some evidentiary value* if officers had obtained a warrant first. *Id.* at 93-94. But the Court of Appeals distinguished the facts of those cases, which had involved field sobriety tests (FSTs) or blood draws taken from suspects detained in a hospital setting, from the facts of this case, which involves a warrantless home entry. The court noted that the home is afforded the greatest protection from state intrusions. *Id.* at 94.

The court then explained the process for determining when a suspect's blood would lose all of its evidentiary value. Because alcohol dissipates gradually and in a relatively predictable manner, the state can use a process called retrograde extrapolation to work backwards from a suspect's later BAC test results and estimate the suspect's BAC at the time that he or she was driving. *Id.* at 98; *see State v. Eumana-Moranchel*, 352 Or 1, 5, 277 P3d 549 (2012) (describing retrograde extrapolation). According to the court, retrograde extrapolation can prevent a suspect's previous BAC level from losing all evidentiary value, even while the alcohol in the suspect's body is dissipating. *Ritz*, 270 Or App at 98.

As a result, the Court of Appeals concluded that the evidentiary value of BAC evidence is lost "only when so much alcohol has been removed from the bloodstream that retrograde extrapolation can no longer produce a reasonably accurate estimate of the suspect's BAC at the time he or she was driving." *Id.* The court presumed that a reliable retrograde extrapolation could be obtained until a suspect's BAC level reaches 0.00. *Id.* at 100 n 4. The court further held that, "in the absence of contrary information about defendant's actual condition," police could rely on the assumption that, at the time of the accident, defendant had a BAC level of 0.08, the statutory threshold for intoxication. *Id.* at 100.

Relying on Spini's testimony that alcohol dissipates on average at 0.015 BAC per hour, the Court of Appeals then held,

"With a dissipation rate of 0.015 per hour, it would take approximately five hours and twenty minutes for a person's BAC to drop from 0.08 to 0.00. A little more than four hours elapsed between defendant's accident and the breath test. If police believed that it could take as long as 90 additional minutes to obtain a warrant (a reasonable estimation on this record), they could foresee a substantial possibility that defendant's BAC would have dropped from 0.08 (the threshold level for liability) to zero by the time it could be measured. On those facts, the police had an objectively reasonable basis to believe that waiting for a warrant would have resulted in the complete loss of evidence. In short, even considering the relative severity of the state's intrusion and the broadness of its scope, the timing of the search indicates that it was reasonable under these specific circumstances."

*Id.* at 100-01 (footnote omitted).

Thus, the Court of Appeals upheld the trial court's denial of defendant's motion to suppress, but it did so on grounds that substantially undermined the arguments that the state had presented. The state petitioned for review, seeking to affirm the result reached by the Court of Appeals but under different reasoning. This court allowed the state's petition. Although defendant neither petitioned for review nor filed a response to the state's petition that contained a contingent request for review, we nevertheless exercise our discretion to consider defendant's arguments for reversing the result reached by the Court of Appeals. ORAP 9.20(2).[2]

---

[2] Ordinarily, a party seeking reversal of a Court of Appeals decision will either petition for review itself or make a contingent request for review in its response to the opposing party's petition for review. *See* ORAP 9.05(4) (describing the contents of a petition for review); ORAP 9.10(1) (allowing a response to a petition for review to raise contingent requests for review). Although defendant took neither of those steps in this case, this court has the discretion to "consider other issues that were before the Court of Appeals." ORAP 9.20(2). We choose to reach defendant's argument in this case because the state did not object to defendant's arguments for reversal and because those arguments had been properly before the Court of Appeals, raised purely legal questions, and were closely connected to the question presented by the state in the petition for review that this court allowed. *Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 457, 235

## II.   ANALYSIS

On review, the state argues that the Court of Appeals' analysis erroneously limits exigent circumstances to those situations where obtaining a warrant would result in losing *all* evidentiary value in the BAC evidence. The state contends, instead, that an exigent circumstance is established if obtaining a warrant would result in losing *any* evidentiary value in the BAC evidence. Defendant, on the other hand, challenges the Court of Appeals' conclusion that the home entry in this case was justified under exigent circumstances, arguing that the reasonableness of the entry must be considered in light of factors other than destruction of evidence, such as the extent of the privacy intrusion, the seriousness of the offense, and the need for the evidence. We first address the parties' arguments under Article I, section 9, and turn to the Fourth and Fourteenth Amendments of the federal constitution only if necessary.

A.   *Framework*

Article I, section 9, of the Oregon Constitution establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." That provision protects against arbitrary and oppressive state interference with the privacy and personal security of the people. *See State v. Fair*, 353 Or 588, 602, 302 P3d 417 (2013) (so stating). The touchstone of that protection is reasonableness. *Id*.

In applying the constitutional standard of reasonableness, "[t]his court has adopted a categorical view *** that, subject to certain specifically established and limited exceptions, deems warrantless searches to be *per se* unreasonable." *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015). Thus, before the state conducts a search, Article I, section 9, generally requires it to obtain a warrant, issued by a neutral magistrate and supported by probable cause, authorizing the search. *State v. Rodgers/Kirkeby*, 347 Or 610, 624, 227 P3d 695 (2010). "The constitution requires a warrant so that a disinterested branch of government—the judicial

P3d 668, *adh'd to on recons,* 349 Or 521, 246 P3d 479 (2010) (describing the standards for exercising discretion under ORAP 9.20(2)).

branch—and not the branch that conducts the search—the executive branch—makes the decision as to whether there is probable cause to search." *State v. Kurokawa-Lasciak*, 351 Or 179, 186, 263 P3d 336 (2011).[3]

The state contends that its warrantless entry into defendant's residence falls within an exception to the warrant requirement—namely, the exigent circumstances exception. Exigent circumstances include situations where the delay caused by obtaining a warrant would likely lead to the loss of evidence. *See State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004) (explaining that an exigent circumstance includes "'a situation that requires police to act swiftly *** to forestall *** the destruction of evidence'" (quoting *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991))).

The state has the burden of proving that the circumstances at the time of the warrantless search fall within the exigent circumstances exception. *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011). To satisfy that burden in this case, the state must establish both that the officers had probable cause and that exigent circumstances justified the officers' warrantless search. *See Snow*, 337 Or at 223 (stating that the exigent circumstances exception "requires both probable cause and an exigency").

The trial court concluded that the state satisfied both requirements. The trial court first found that officers had the probable cause necessary to support searching defendant's residence for his blood-alcohol evidence. According to the trial court, the statements of Wilson-McCullough and Zimmerman supported probable cause to believe that defendant had been driving under the influence of alcohol and that defendant's residence contained evidence of that crime—namely, defendant's BAC. As a result, the trial court determined that the state satisfied

---

[3] *See also State v. Matsen/Wilson*, 287 Or 581, 587, 601 P2d 784 (1979) ("'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" (Quoting *Johnson v. United States*, 333 US 10, 13-14, 68 S Ct 367, 92 L Ed 436 (1948).)).

the probable cause requirement. The parties do not dispute that finding.

Instead, the parties dispute whether exigent circumstances justified the officers' warrantless search. The parties' arguments are largely framed around two recent decisions by this court: *State v. Machuca*, 347 Or 644, 227 P3d 729 (2010) and *State v. Mazzola*, 356 Or 804, 345 P3d 424 (2015). We therefore review those decisions before turning to the parties' arguments.

In *Machuca*, the defendant had caused a traffic accident and was taken to the hospital. 347 Or at 646. An officer gathered evidence at the scene of the accident and then at the hospital, establishing probable cause that the defendant had committed a DUII and still had alcohol in his body. The officer placed the defendant under arrest and the defendant provided a blood draw, which was administered about 90 minutes after the traffic accident. *Id.* at 646-47.[4]

In assessing the constitutionality of that warrantless blood draw, this court stated that, under the facts of that case, such a warrantless search and seizure is permissible, "'unless a warrant can be obtained without sacrificing the evidence.'" *Id.* at 656 (quoting *State v. Milligan*, 304 Or 659, 666, 748 P2d 130 (1988)). The defendant argued that the state failed to meet that burden, because the state failed to establish the reasonable amount of time that the investigating officer could have expected it to take to obtain a warrant. The defendant contended that, without knowing how long it would take to get a warrant, the state could not establish that obtaining a warrant would require sacrificing any of the blood-alcohol evidence being sought.

This court rejected that argument. The officer had acted promptly to obtain the blood sample after completing

---

[4] The officer read the defendant his implied consent rights and consequences and then asked the defendant for consent to perform the blood draw. *Id.* at 646. The defendant consented to the blood test but later argued that his consent was not valid because it had been compelled by threat of legal sanction for refusing to comply. ORS 813.095(1) (establishing "the offense of refusal to take a test for intoxicants"). This court did not reach the question of whether the defendant's consent was valid, because it held that, based on the exigent circumstances, the state was allowed to compel the blood draw. *Machuca*, 347 Or at 657.

his investigation, and because the suspect was in a hospital receiving treatment, medical personnel were already on hand to perform the blood draw. *Id.* at 646-47. Under those facts, any time spent attempting to obtain a warrant would have delayed taking the blood draw. And any delay in taking the blood draw, regardless of how long, would have required sacrificing at least some of the blood-alcohol evidence that was being sought. In support of that point, the court explained that blood-alcohol evidence is in a persistent state of destruction beginning soon after it is consumed and continuing until it has been fully metabolized by the body. *Id.* at 652-57. The court therefore held that, under the facts of *Machuca*, the investigating officer reasonably believed that obtaining a warrant would have sacrificed some of the blood-alcohol evidence being sought. *Id.* at 656-57.

In *Mazzola*, the court considered the constitutionality of a warrantless field sobriety test (FST) of a DUII suspect based on the natural dissipation of an unknown, non-alcohol intoxicant. 356 Or at 807, 817. As in *Machuca*, the record did not establish how long it would have reasonably taken the officer to obtain a warrant. And, because the investigating officer in that case knew only that the suspect appeared to be under the influence of a drug, but did not know which drug, the officer did not know the rate of dissipation. *Id.* at 809. The defendant argued that, without those pieces of information, the state could not establish that obtaining a warrant would require sacrificing the evidence being sought.

The court rejected that argument, stressing that the state had been attempting to prove the DUII based on evidence of impairment other than a chemical analysis of the defendant's breath or blood. *Compare* ORS 813.010(1)(a) (establishing DUII when driver "[h]as 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person") *with* ORS 813.010(1)(b) (establishing DUII when driver "[i]s under the influence of intoxicating liquor, cannabis, a controlled substance or an inhalant"). When attempting to prove the DUII based on evidence of impairment other than a chemical analysis, "the most probative evidence generally will consist of observations made while—or close in time after—the defendant was driving." *Mazzola*, 356 Or

at 818-19. In those circumstances, the state could prove an exigency despite the lack of evidence establishing the dissipation rate and the time it would take to obtain a warrant.

The court went on to explain that, "where a warrantless search for evidence of the crime of DUII is supported by probable cause to arrest the defendant, the issue of exigency should be assessed in light of the reasonableness of the search in time, scope, and intensity." *Id.* at 819-20. The court held that the facts in that case "established a sufficient exigency to justify the warrantless administration of the FSTs in this case." *Id.* at 820.

> "Here, limited testing designed to detect evidence of current impairment was performed on a person who already had been validly stopped and also was subject to arrest for DUII. The tests at issue were limited in scope and intensity; they did not intrude into defendant's body; rather, they assessed her coordination, balance, and motor skills. Those tests constituted probative evidence of an element— current impairment—of the crime of defendant's arrest, they were administered soon after defendant had been observed driving, and they immediately preceded her arrest. With respect to exigency, there also was evidence that over time the body filters drugs and they dissipate in one's body, that various drugs can dissipate at different rates, and that the effects of drugs wear off over time. Again, the challenged FSTs assess a motorist's impairment at the time of driving, not at a later time."

*Id.* (quotation omitted).

### B.  *The Parties' Arguments*

As noted, the parties dispute whether exigent circumstances justified the officers' warrantless search in this case. The state reads both *Machuca* and *Mazzola* as upholding the constitutionality of a warrantless exigency search based on the loss of any evidence of an intoxicating substance in the suspect's body. According to the state, delaying entry into defendant's residence in this case would have allowed additional blood-alcohol evidence to dissipate, thus sacrificing at least some of the evidence being sought, as in *Machuca* and *Mazzola*. The state therefore argues that, under *Machuca* and *Mazzola*, the officers' warrantless entry

into defendant's residence was constitutional in this case and that the Court of Appeals' reasoning was erroneous.

Defendant, on the other hand, contends that an exigency search is justified only when the law enforcement interests advanced by a warrantless search outweigh the privacy interests at stake. Defendant argues that, although preventing the destruction of evidence is a legitimate law enforcement interest, the weight of that interest must be discounted by the chance that an exigency search will fail to prevent the evidence from being destroyed. Defendant points out that, in this case, in order to preserve defendant's BAC evidence without a warrant, the officers were statutorily required to obtain his consent, which the investigating officers had no reason to expect.

Further, defendant argues that the privacy interests at stake in a home invasion are more intrusive than the blood draw in *Machuca* and the FSTs in *Mazzola*. As this court recently stated, "A government intrusion into the home is at the extreme end of the spectrum: 'Nothing is as personal or private. Nothing is more inviolate.'" *Fair*, 353 Or at 600 (quoting *State v. Tourtillott*, 289 Or 845, 865, 618 P2d 423 (1980) (emphasis added)). One's home is "the quintessential domain protected by the constitutional guarantee against unreasonable searches." *State v. Guggenmos*, 350 Or 243, 250, 253 P3d 1042 (2011) (internal quotation marks and citation omitted). Defendant points out that, because "[t]he very purpose of our constitutional provision was to protect a person's home from governmental intrusions," the right against intrusion into the home "should be stringently protected by the courts." *State v. Davis*, 295 Or 227, 243, 666 P2d 802 (1983).

At its core, the parties' dispute is about the factors that courts should consider, and how those factors should be weighed, in determining whether an exigency search is justified. The state, in effect, gives decisive weight to the question of whether obtaining a warrant would delay preserving evidence that is dissipating. Defendant maintains that preventing the further dissipation of evidence is merely a component of the law enforcement interest that must then be weighed against the extent the privacy interests invaded by a search.

C. *Evidentiary Deficiencies*

The record before us, however, does not allow us to resolve that dispute. Regardless of what other factors, if any, might be considered when determining whether an exigency search is justified, the state must prove that there was, in fact, an exigency. In this case, that means that the state must establish that officers reasonably believed that the delay caused by obtaining a warrant would likely lead to the loss of evidence. The state argues that delaying entry into defendant's residence in this case would have allowed additional blood-alcohol evidence to dissipate. But the record does not support such a conclusion.

Here, the record demonstrates that the officers were seeking defendant's BAC. That is the same evidence that was sought by the blood draw in *Machuca* and explains the state's reliance on that case. *Machuca* is distinguishable, however, because a blood draw directly preserves a defendant's BAC, but a home entry does not. A blood draw removes a sample of blood from the defendant's body and therefore removes a sample of blood from the body's metabolic processes causing the blood-alcohol evidence to dissipate. The sample is then used to test a defendant's BAC at the time of the blood draw. Thus, any delay in performing the blood draw necessarily equates to a delay in preserving the evidence.

The same is not true for a home entry. The metabolic process causing the blood-alcohol evidence to dissipate does not stop simply because officers have entered a defendant's home. Instead, to preserve a defendant's BAC, officers entering a home must then also obtain and test a sample of the defendant's breath or blood.[5] As a result, the appropriate question in determining whether there was an exigency is not whether obtaining a warrant would have delayed entering defendant's home. The appropriate question is whether

---

[5] A urine sample may be used to "determin[e] the presence of cannabis, a controlled substance or an inhalant in the person's body." ORS 813.131(1). And an officer may request a urine sample under only if the officer has specific training in recognizing drug-impaired driving and has reasonable suspicion that the defendant engaged in drug-impaired driving. ORS 813.131(2). The record in this case provides no grounds for requesting defendant to provide a urine sample and the state does not contend that the officers intended to request one from defendant.

obtaining a warrant would have delayed obtaining and test-
ing a sample of defendant's breath or blood.

As noted above, defendant volunteered to take a
breath test after arriving at the police station. Although, in
hindsight, it may be apparent that delaying entry to obtain
a warrant to enter the home might have delayed defendant's
voluntary breath test, defendant's willingness to volunteer
for a breath test was not known to the officers at the time
they entered defendant's residence. And the time that the
officers entered the home is "the relevant temporal reference
point" for us to consider. *Bonilla*, 358 Or at 488; *see also
id*. at 487 ("When an exigency-based exception applies, the
lawfulness of a search depends on what a reasonable person
would make of the facts known to the officer at the time of
the search."). Defendant's conduct up to that point did not
suggest a willingness to cooperate with the officers. In fact,
Trooper Spini testified that he believed defendant would
refuse to provide a breath test if asked to do so.

Thus, at the time that officers entered defendant's
home, they had no reason to think that obtaining a warrant
to enter the home would delay a consensual search for defen-
dant's BAC evidence, because they had no reason to think
that defendant would consent to such a search. As defendant
points out, without satisfying the statutory standards for
consent, the officers were required by statute to obtain a
warrant (or some other type of court order) to obtain defen-
dant's BAC evidence. Under ORS 813.100(1), an officer
may request that a DUII defendant submit to a chemical
test that would determine his or her BAC.[6] But, under ORS
813.100(2) and ORS 813.320(2)(b), if the defendant refuses

---

[6] ORS 813.100(1) ("Any person who operates a motor vehicle upon premises
open to the public or the highways of this state shall be deemed to have given con-
sent, subject to the implied consent law, to a chemical test of the person's breath,
or of the person's blood if the person is receiving medical care in a health care
facility immediately after a motor vehicle accident, for the purpose of determining
the alcoholic content of the person's blood if the person is arrested for driving a
motor vehicle while under the influence of intoxicants in violation of ORS 813.010
or of a municipal ordinance. A test shall be administered upon the request of a
police officer having reasonable grounds to believe the person arrested to have
been driving while under the influence of intoxicants in violation of ORS 813.010
or of a municipal ordinance. Before the test is administered the person requested
to take the test shall be informed of consequences and rights as described under
ORS 813.130.").

to provide a sample, then an officer may compel the defendant's cooperation by obtaining a warrant.[7]

If, at the time that the officers entered defendant's home, a warrant was statutorily required to obtain and test defendant's BAC evidence, then it is not clear how requiring the officers to obtain a warrant to enter the home—rather than after entering the home—was likely to delay preserving defendant's BAC evidence, particularly because the officers were capable of applying for a warrant from the scene. In other words, obtaining a warrant prior to entering the home would have delayed entering the home. But, if officers were required to obtain a warrant in order to preserve defendant's BAC, then obtaining a warrant before entering defendant's home would not have delayed preserving defendant's BAC evidence. As a result, based on the record and arguments before us, the state has not even satisfied the exigency standard that it reads *Machuca* as applying.

In response to that, the state simply changes the evidence it says the officers were seeking. The state notes that if a defendant refuses an officer's request to provide a sample for chemical testing, then the state may use that refusal as evidence against the defendant. *See* ORS 813.310 ("[E]vidence of the person's refusal is admissible in any civil or criminal action, suit or proceeding arising out of acts alleged to have been committed while the person was driving a motor vehicle on premises open to the public or the highways while under the influence of intoxicants."); ORS 813.130(2)(a) ("If the person refuses a test or fails, evidence of the refusal or failure may also be offered against the

---

[7] ORS 813.100(2) ("No chemical test of the person's breath or blood shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130."); ORS 813.320 (2)(b) ("The provisions of the implied consent law shall not be construed by any court to limit the introduction of otherwise competent, relevant evidence of the amount of alcohol in the blood of a defendant in a prosecution for driving while under the influence of intoxicants if: *** The evidence is obtained pursuant to a search warrant."); *see also* ORS 813.100(5) ("Nothing in this section precludes a police officer from obtaining a chemical test of the person's breath or blood through any lawful means for use as evidence in a criminal or civil proceeding including, but not limited to, obtaining a search warrant.").

person.").  So, according to the state, the home entry would lead to evidence against defendant even if he refused to provide a sample.

We reject that argument. Even if the officers had anticipated that defendant would refuse to provide a sample, any anticipated refusal is not evidence capable of supporting an exigency search, because it is evidence that did not yet exist (and never did exist) and it is not subject to destruction or dissipation. Thus, although a warrantless home entry might *produce* evidence of a refusal, it is not accurate to say that a warrantless home entry would *preserve* evidence of a refusal.

Finally, the state also argues that the officers were searching for observational evidence—specifically, whether defendant *appeared* intoxicated. That observational evidence is distinct from a chemical test of a defendant's breath or blood, even though both types of evidence are used to establish a defendant's intoxication. *Compare* ORS 813.010(1)(a) (establishing DUII when a person's BAC is at or above 0.08 percent) *with* ORS 813.010(1)(b), (c) (establishing DUII when a person is under the influence of intoxicants). Observational evidence was sought by the FST used in *Mazzola* and explains the state's reliance on that case.

But *Mazzola* is distinguishable because none of the officers in this case testified before the trial court that observational evidence was the object of their search.[8] In short, the trial court did not make, and was not asked to make, a finding that the officers had probable cause to enter defendant's home on that basis. We cannot presume that such probable cause evidence exists. *See Guggenmos*, 350 Or at 260 ("[W]e cannot presume the existence of other

---

[8]  The state presented no argument to justify considering the possible destruction of evidence other than that testified to by the investigating officers. Further, in *Mazzola*, the officer directly observed the defendant's intoxication immediately before asking the defendant to perform the FST. 356 Or at 806. In this case, however, approximately three hours separated the last time defendant was observed to be intoxicated. And there is no record evidence regarding how much alcohol a reasonable officer would believe remained in defendant's body at the time the officers entered his home or the amount of alcohol that must remain to produce observable effects.

favorable facts; we must confine our review to the record made." (Quotation omitted.)).[9]

As a result, the record does not establish that the officers reasonably believed, at the time that they entered defendant's home, that obtaining a warrant would have delayed preserving evidence that was dissipating. The state therefore failed to establish that the officers reasonably believed that they were faced with an exigency in this case. We recognize that, by deciding this case on the facts, we are not resolving the legal question that the parties have brought to us—namely, what factors should be considered in determining whether an exigency search is justified. However, because the state failed to establish the existence of an exigency, the state cannot justify its warrantless search as an exigency search, regardless of what other factors should be considered or how those factors should be weighed.

### III.   CONCLUSION

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further consideration.

---

[9] Similarly, the Court of Appeals held that "in the absence of contrary information about [a] defendant's actual condition, police could reasonably rely on the presumptive threshold for DUII in Oregon—0.08 percent BAC by weight—as a guidepost." *Ritz*, 270 Or App at 100. And the court presumed that blood-alcohol evidence loses all of its evidentiary value when it reaches a BAC level of 0.0 percent. *Id.* at 100 n 4. But, without some evidentiary support, the use of such presumptions improperly relieves the state of its burden to prove that officers reasonably believed that the blood-alcohol evidence was at risk of complete dissipation. *See Baker*, 350 Or at 647 ("The state has the burden of proving that circumstances existing at the time were sufficient to satisfy any exception to the warrant requirement.").